1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

**MARK VINCENT TEDESCHI**,

                                          Petitioner,

           vs.

**DEBRA DEXTER, Warden, et al.**

                                          Respondents.

CASE NO. 08cv0820-JLS(CAB)

**ORDER DENYING 28 U.S.C. § 2254 HABEAS PETITION AND GRANTING IN PART A CERTIFICATE OF APPEALABILITY**

20
21
22
23
24
25
26
27
28

        Petitioner Mark Vincent Tedeschi ("Tedeschi"), a state prisoner proceeding with the assistance of counsel, seeks a 28 U.S.C. § 2254 writ of habeas corpus to set aside his second-degree murder conviction.   He is serving an indeterminate life sentence for the November 1995 shooting death of his ex-father-in-law.  He alleges as violations of his federal constitutional rights three instances of juror misconduct in the course of their deliberations.  Respondent filed an Answer and lodged an extensive record.  (Dkt Nos. 11, 12; Lodgs. 1-17.)  Tedeschi filed a Traverse and provided four additional lodgments to complete the record.  (Dkt Nos. 13, 14, 15; Lodgs. A-D.)  By Order entered November 25, 2008, this matter was reassigned from the bench of the United States District Court for the Eastern District of California, Fresno Division, to visiting District Judge Janis L. Sammartino,

1   United States District Court for the Southern District of California.  (Dkt No. 17.)  After careful

2   consideration of the parties' arguments, the trial transcript, transcripts and rulings from pertinent

3   subsequent proceedings, and controlling legal authority, for the reasons discussed below, the Petition

4   is **<u>DENIED</u>**.

5   **I.      BACKGROUND**

6       **A.      <u>Factual Background</u>**

7        On January 4, 1996, the Kern County District Attorney charged Tedeschi with first degree

8   murder and lesser-included offenses in the shooting death of his ex-father-in-law at Tedeschi's house

9   in November 1995, witnessed by his nine-year-old daughter.  Additional charges included personal

10  use of a firearm in the commission of the murder and lying in wait.  Tedeschi pled not guilty and

11  denied the special allegations on January 16, 1996.  He was tried for the offense three years later, in

12  February 1999.  (Lodg. 15, Vol. 10, RT 5467- 5622.)  He testified on his own behalf.  He admitted

13  shooting Robert Leisten, but contended it was an excusable or justifiable homicide, not murder.  As

14  noted by the trial court and as characterized by the Respondent, the trial result turned on the credibility

15  of the only two witnesses to the killing.  "After Mr. Tedeschi took the stand, we have Mr. Tedeschi and

16  Tiffani Tedeschi, the only percipient witnesses, agreeing that Mr. Tedeschi is the killer. . . . [A]s far

17  as who pulled the trigger, there is no dispute."  (Lodg. 15, Vol. 11, RT 5699.)

18       Federal habeas courts presume the correctness of a state court's determination of factual issues.

19  28 U.S.C. § 2254(e)(1) (the petitioner has "the burden of rebutting the presumption of correctness by

20  clear and convincing evidence").  The Court culls pertinent facts from the Court of Appeal's summary

21  of the underlying crime and associated proceedings in its 47-page August 8, 2001 Opinion affirming

22  the judgment on direct appeal, provided as Respondent's Lodgment 4, and from that court's 23-page

23  January 17, 2008 Opinion denying Tedeschi's habeas petition presenting the same three claims

24  forming the subject matter of his federal habeas petition ("Petition"), provided as Respondent's

25  Lodgment 12.  The Court has also augmented the detail from its independent review of the trial

26  transcript for its bearing on the strength of the government's case.  (Lodg. 15, Vols. 1-11.)

27       Tedeschi and his wife Shelley separated multiple times following their marriage in 1984.  In

28

the summer of 1994, Shelley again left Tedeschi to live at her parents' house, taking with her their nine-year-old daughter, Tiffani.  The couple unsuccessfully attempted to reconcile in July and September of that year.  Neighbors witnessed an incident in September 1994 when Tedeschi accused Shelley of seeing a man named Frank and held her on the ground when she could not convince him otherwise.  The couple made no further attempts to reconcile thereafter.  Tedeschi continued to accuse Shelley of seeing other men, and he started divorce proceedings.

In September 1995, Shelley bought a home where she moved with her sister and Tiffani.  That same month, Shelley told Tedeschi she would turn him in to the district attorney for nonpayment of child support.  Tedeschi angrily threatened to kill her if she did so, and made a similar threat in October 1995.  Tedeschi denied making the statement to Shelley, "Your days are numbered, bitch," on a prior occasion.  (Lodg. 15, Vol. 10, RT 5545-5547.)

On Friday, November 10, 1995, Shelley's father, Robert Leisten ("Leisten"), drove Tiffani to Tedeschi's house at about 6:00 p.m. for her weekend visit.  Tedeschi was not home, so Leisten took Tiffani back to his house.  Later, Tedeschi called Leisten's house and told Tiffani to have her mother bring her over.  At about 7:30 that evening, Shelley and Leisten together took Tiffani there.  They stayed in the car while Tiffani got out and went to the front door.  Tedeschi asked her who was in the car, then told her to enter by the back door.  When she came in, she saw a "big" gun leaning up against the couch with a "knife on the end," and her father acting "kind of jumpy."  (Lodg. 4, p. 4.)

Shelley dropped her father off at his house on her way home.  When she got home, her friend (now husband) Lynn Gudmundson told her Tedeschi had called while she was gone.  Tedeschi called again within a few minutes, telling Shelley "you must have said your prayers tonight."  She asked, "What do you mean by that?" and he responded, "You figure it out."  (Lodg. 15, Vol. 3, RT 4112-4113.)  He questioned her about whom she was dating.  He got angry when she told him it was no longer his business, and she hung up.  The phone rang again, and Shelley let the answering machine pick up.  Tiffani left a message to come pick her up.  A few minutes later, Tiffani left a second message on the machine to say Tedeschi was bringing her home.  Shelley was afraid to be there when he arrived, so she and Gudmundson left a note on her door and went to Leisten's house around the

corner, letting themselves in when they found he was unexpectedly out.  Tiffani testified her calls to Shelley were both at Tedeschi's instructions.  After she left the messages for Shelley, he instructed her to call Leisten to come pick her up.  Leisten asked her what was wrong, and she told him she did not know, just to come pick her up.  She told Tedeschi after that call, "They're going to pick me up."

After the call to Leisten, Tedeschi drove with Tiffani to a nearby liquor store, where he bought a cigar, a bottle of tequila, a lime, and candy for Tiffani.  He stated he was "going to have a celebration."  He paid his tab at the store, then they returned to his house.  Tiffani testified Tedeschi drank a shot of tequila when they got back to his house, gave her a hug, and told her he was sorry.  Tiffani heard Leisten's car horn, told Tedeschi, "They're here," then went to get her overnight bag.  She walked through the living room toward her bedroom, but Tedeschi stopped her in the hallway.  Tiffani saw two guns, both about three feet long, leaning against the wall, with Tedeschi handling the one with the bayonet.  He told her to go tell Leisten to come into the house, and she did so.  Leisten left his car and followed Tiffani a few feed inside the front door.  Tedeschi walked over and slammed the door behind him.  He said twice to Leisten, "You and your daughter," then laughed.  Leisten said he did not know what Tedeschi was talking about.  Tedeschi then "walked over to the gun and picked it up and said, 'Well,' and then shot him" from a few feet away as he stood by the door.  Tiffani screamed and ran out of the back door to the neighbors crying when her grandfather fell to the ground holding his knee or leg, grabbing the phone on her way.  Next-door neighbors, the Aragons, took her into their house.  She told them her dad had shot her grandfather.  Mrs. Aragon called 911, relaying information between the operator and Tiffani.  Other neighbors  heard the shot and had also called police.

Tiffani identified from a photo "the gun that my dad shot my grandpa with." (Lodg. 15, Vol. 4, RT 4220-4310.)  She also testified about her conversations with police officers that night, her impression her father did not appear to be aiming the gun when he shot it, and revisited the details of the trips over and back from her father's house that night and the various phone calls she made or

1  overheard.[1]  (Id., RT 4310- 4360.)

2      Contrary to Tiffani's version of the shooting, Tedeschi testified he walked into the living room

3  and was surprised to see Leisten standing in the middle of the room.  He said the men argued over

4  money Leisten claimed Tedeschi owed Shelley, while Tedeschi accused Leisten of owing him money.

5

6  [1] The prosecution presented considerable other evidence.  Additional witnesses included:  Dr. George Buldoc, M.D., a forensic pathologist who performed the autopsy on Robert Leisten in November 1995, and described the victim's extensive injuries on face and torso in addition to the two gunshot wounds (Lodg. 15,

7  Vol. 2, RT 3924-3972, Vol. 3, RT 3875-4033); Shelley Tedeschi Gudmundson, who testified about her relationship with Tedeschi, her fear of him, his threats to her, issues regarding his overdue child support

8  payments, and the details of the day of the Hereda (Lodg. 15, Vol. 3, RT 4048-4190); Antonio Hereda, a neighbor of Tedeschi's, who had witnessed and intervened until police arrived in Tedeschi's September 26, 1994

9  attack on Shelley outside their house, with her screaming and Tedeschi angrily asking about a man named Frank (Lodg. 15, Vol. 3, RT 4190-4196); Larry Hobbs, a decades-long friend of Tedeschi's, who testified about an

10  incident six months before the November 10, 1995 shooting, the last time he had seen Tedeschi, when Tedeschi came to his house to accuse him, angrily and mistakenly, about talking with Shelley's behind his back, implying

11  they were having an affair (Lodg. 15, Vol. 4, RT 4202-4219); the cashier at the liquor store (Lodg. 15, Vol. 4, RT 4365-4395); Lynn Gudmundson, Shelley's second husband, who described the phone calls from Tedeschi

12  and Tiffani the night of the shooting, his suggestion they go to Shelley's father's house to avoid any confrontation when Tedeschi dropped Tiffani off, Shelley taking a call there then yelling, "He had just shot my

13  dad," and driving her to Tedeschi's house (Lodg. 15, Vol. 5, RT 4401-4436); Ray Stamper, a neighbor of Tedeschi's, who testified he heard a loud shot, then a female voice screaming, he called 911 then went outside

14  to look, seeing their neighbor, Mr. Aragon, outside his house next door to Tedeschi's, seeing Tedeschi at his open door turning away from them and closing the door before police arrived, and describing the SWAT team

15  operations (Lodg. 15, Vol. 5, RT 4440-4461); Roger Dixon, a deputy sheriff dispatched to Tedeschi's house at about 8:15 p.m. that night, who testified he saw several people standing at their front doors all pointing at

16  Tedeschi's house, saw a small truck parked in front of the residence with the lights still on and engine running but no one inside it, knocked several times on Tedeschi's locked door and identified himself, hearing nothing

17  from inside and unable to see inside, his interview with a hysterical Tiffani, who told him her father had shot her grandfather in the leg with a long rifle, and a second interview with Tiffani (Lodg. 15, Vol. 5, RT 4461-

18  4485); other law enforcement personnel who responded to the incident, including negotiators, who described their efforts before a SWAT forced entry became necessary about midnight when Tedeschi did not respond,

19  finding the victim and Tedeschi inside and their condition(s), and his arrest details (Lodg. 15, Vol. 5, RT 4486-4545, RT 4549-4572); evidence technicians who described the crime scene evidence they collected and

20  processed; investigators' testimony regarding interviews with witnesses and analyses of clothing, weapon, and other evidence (Lodg. 15, Vol. 5, RT 4572-4604, Vol. 6, RT 4617-4662, RT 4684-4707, RT 4719-4743, RT

21  4765-4797, Vol. 7, RT 4840-4857, RT 4859-4942, RT 4946-4995, RT 5000-5007); testimony from the 911 operator authenticating the procedures, law enforcement response, and the record of Mr. Stamper's call and

22  Tiffani's call through Mrs. Aragon (Lodg. 15, Vol. 6, RT 4744-4765);  Mrs. Aragon, who testified she heard the horn honk from a vehicle outside Tedeschi's house, heard a gunshot, took Tiffani into her house when she

23  ran over from Tedeschi's house screaming and hysterical, placed the 911 call for her, authenticated the conversation on the 911 tape, and Tiffani's call to her mother from the Aragon house (Lodg. 15, Vol. 6, RT

24  4797-4811); the 911 tape itself played for the jury (Lodg. 15, Vol. 6, RT 4805); Mr. Aragon, who testified he heard a horn honk, looked out his window and saw a small truck he identified as belonging to "Shelley's dad"

25  parked in front of Tedeschi's house, then heard a gunshot about three minutes later, ran over to the house, stopping in Tedeschi's driveway, seeing Tiffani run out the back door and her telling him her "daddy shot her

26  grandpa in the leg," continuing to Tedeschi's front steps where he saw the door open about a foot and Tedeschi inside "running back and forth" and seeming "confused,"describing a conversation he had with Tedeschi in the

27  summer of 1995 in their adjoining back yards when he told Mr. Aragon he wanted to kill his mother-in-law because he "just hated her" and had "a bunch of bad things" to say about Mr. Leisten associated with money

28  he contended Leisten owed him for some electrical work. (Lodg. 15, Vol. 6, RT 4811-4828).

He testified the conversation got "very aggressive" and hostile, with the men exchanging insults.  He said he was afraid of Leisten, who was the bigger man.  He said Leisten struck him in the face, and Tedeschi struck him back.  Leisten grabbed him, and Tedeschi kept hitting until a blow from Leisten knocked him down.  Tedeschi testified he was very frightened by then and scrambled down the hall into the office, grabbed his most intimidating rifle out of his unlocked gun safe, took the safety off, and returned to the living room where Leisten was still standing.  He told Leisten to get out, but instead he stepped forward and tried to grab the rifle.  Tedeschi testified he fired the weapon because he thought Leisten was going to take it and come after him.  When he realized how upset Tiffani had become, he said to Leisten, "Look what you caused to happen, you son of a bitch, why did you come in the house," and Leisten answered, "I don't know."  (Lodg. 4, pp. 6-8.)

Police first arrived about 8:15 p.m., followed at about 9:30 p.m. by a SWAT team which forcibly entered the house around midnight.  They found Leisten lying dead on the floor with two gunshot wounds and evidence of blunt force injuries, including a fractured nose and damage to his left eye.  He had bled to death.  (Lodg. 4, p. 6.)  They found Tedeschi lying in the hallway with a towel over his face to shield it from tear gas and a rifle barrel under his chin.  He at first refused to respond to the officers' demands, then let go of the rifle and yelled at them to shoot him.  All six officers finally subdued him after a short struggle.  They found notes he wrote asking Tiffani to pray for him, telling Shelley "You wouldn't talk to me, this is the price you pay," and asking for mercy on his soul.  (Id..)

The defense theory was essentially self-defense.  Additional detail from Tedeschi's testimony fleshed out his state of mind and addressed and attempted to recharacterize portions of others' testimony, in particular Tiffani's.[2]  He testified he finished work early that Friday in anticipation of

---

[2]  The defense evidence aimed to expose inconsistencies in Tiffani's story and other prosecution testimony.  In addition to Tedeschi, defense counsel called the deputy sheriff who briefly interviewed Shelley at about 8:30 p.m. on November 10, 1995 (Lodg. 15, Vol. 8, RT 5032-5053); Shelley's sister; recalled detectives and prosecution investigators regarding the content of interviews with Shelley and others two or three years after the shooting regarding her relationship with Tedeschi, prior threatening incidents, and the like, as well as the defense investigator and the original prosecutor assigned to the case in 1995 (Lodg. 15, Vol. 8, RT 5054-5085, RT 5098- 5108, RT 5120-5134, RT 5109-5119); a defense expert criminologist regarding alcohol testing of samples from Tedeschi drawn the night of the shooting (Lodg. 15, Vol. 8, RT 5134-5146, RT 5150-5159); the deputy who testified from his reports of his two preliminary interviews  with Tiffani, while the SWAT maneuvering was on-going, about the sequence of events leading to the shooting and not materially different from her trial testimony (Lodg. 15, Vol. 8, RT 5160- 5191); a hostage negotiator who had responded as part of the SWAT team testified about his interview with Tiffani at about 9:10 p.m. during which she

a trip to Magic Mountain he was arranging for Tiffani over the weekend, a special three-day visitation for her birthday.  (Lodg. 15, Vol. 10, RT 5470-5472.)  He took his car to have new tires installed starting at about 3:30 p.m., consumed two beers in Sear's parking lot and two more beers in a lounge waiting for the car to be finished, and was "having a buzz" by the time the car was ready.  (Id., RT 5484-5492, RT 5494.)  He was running late but did not call Shelley or Leisten to let them know.  By the time he got home at about 6:40 p.m., he was still feeling intoxicated and had missed the drop-off time.  He called Shelley to let her know he was home and she could bring Tiffani over.  Shelley told him they had already been by his house, and Tiffani was at the Leisten residence.  Tedeschi called there and told Tiffani to have her mom drop her off.  (Id., RT 5495-5500.)

Tedeschi testified Tiffani arrived at his house while he was on the phone with a friend.  When she came to the front door, he called out to her that she should go around back, where he met her at the gate.  He testified all five of his loaded rifles were in his unlocked gun safe at all times until he retrieved one from the gun safe during his fight with Leisten, contrary to Tiffani's testimony.  (Lodg. 15, Vol. 10, RT 5502-5505, RT 5508.)  He made the decision to take Tiffani home after she had been there about fifteen minutes because his friend had been unable to get discount tickets to Magic Mountain, he wanted to use Saturday morning to get her a gift.  (Id., RT 5506-5507, RT 5526-5527.)  He testified he called Shelley at about 7:15, leaving a message on the answering machine, then called back a few minutes later when Gudmundson answered.  Tedeschi asked him whether he was there for Shelley or for her sister.  He testified he asked only because he cared about who his daughter had

confirmed the chronology of events, consistent with her trial testimony, including her seeing two rifles in the hallway, her grandfather's arrival at Tedeschi's house, her father's instruction she go out to the truck and have her grandfather come inside, her father closing the door and  making the statement to Leisten, "you and your daughter, you and your daughter," his bringing from the hallway into the living room an "Army-type gun" then shooting her grandfather in the leg, her running from the house to the neighbor's, and the information her grandfather was not armed and had not provoked the attack (Lodg. 15, Vol. 8, RT 5191-5223); a recalled deputy who testified about the September 26, 1994 assault incident he responded to and a two-hour interview with Shelley, memorialized in a  report, where she expressed concern for Tedeschi's mental state, indicated he was possibly abusing methamphetamine, suffered from bouts of depression and paranoia and extreme mood swings (Lodg. 15, Vol. 9, RT 5308-5320); two recalled witnesses who testified about Tedeschi's odd behavior, paranoia, mood swings and depressed periods during 1995, with one testifying he took Tedeschi for drug counseling in early 1995 (Lodg. 15, Vol. 9, RT 5322-5328, RT 5339-5345, RT 5348-5352); and Tedeschi's half-brother, who testified Tedeschi talked about ongoing conspiracy as a fairly constant theme starting in 1992, in particular in 1995, when Tedeschi believed the Kern County Sheriff's Department had it in for him, he perceived people's conversations in public and newspapers were about him, and imagined veiled threats (Lodg. 15, Vol. 10, RT 5445-5463).

1   contact with, not who Shelley was dating, since they were divorced.  (<u>Id.</u>, RT 5509, RT 5511-5515.)

2   Shelley called him back to ask what he wanted, and while they were talking, he admitted he made the

3   statement, "You must have said your prayers," but purportedly not to Shelley, but rather to Tiffani.

4   Tedeschi characterized Shelley as angry during that call while he was not, although he conceded he

5   was speaking in a loud tone of voice.  He told Shelley he was going to bring Tiffani back home.  She

6   said she did not want him coming to her house.  ( <u>Id.</u>, RT 5522.)  He asked her about the man who had

7   answered the phone and about another man, Larry Hobbs, who he believed was harassing and stalking

8   him.  He put Tiffani on the phone to tell Shelley, "Tell the truth or else" because he was in the process

9   of filing restraining orders against people he believed were harassing him, including Hobbs and

10  Shelley.  (<u>Id.</u>, RT 5519-5524, RT 5525.)

11       Tedeschi testified he went back into the kitchen to do dishes while Tiffani was still on the

12  phone with Shelley.  She came in to tell him, "They're going to come pick me up."  (Lodg. 15, Vol.

13  10, RT 5525, 5557.)   He denied he told Tiffani to make any phone calls.  (<u>Id.</u>, RT 5531-5532.)  He

14  denied he told Tiffani to call her grandfather to come pick her up, and he did not know who would be

15  coming.  (<u>Id.</u>, RT 5544.)  He explained the quick trip to the liquor store as intended to buy cigarettes,

16  not alcohol, but he accepted an employee's suggestion he purchase tequila while he was there.  (<u>Id.</u>,

17  RT 5557.)  Since it was his payday, he also decided to pay off his tab, but denied making the

18  statements to store personnel that he was going to have a celebration.  He denied he said to store

19  personnel, this "is going to be damn good," claiming he actually said "no, this will be good" in

20  response to the cashier's question would there be anything else.  He suggested the employees'

21  impressions of his demeanor were perhaps because he was tired and had had a few beers.  (<u>Id.</u>, RT

22  5536-5542.)

23       Tedeschi testified he was "in my kitchen slicing lemons, and I had taken a few drinks of

24  tequila" (Lodg. 15, Vol. 10, RT 5558-5559) and was on the phone trying to call a friend when Tiffani

25  told him, "They are here."  He heard no horn honk (<u>Id.</u>, RT 5474-5475, RT 5555-5556) and disputed

26  Tiffani's testimony the horn honked while she was on the phone placing a call for him as he fiddled

27  with two of his rifles in the hallway.  (<u>Id.</u>, RT 5565,  RT 5561-5562.)  He denied he told Tiffani to go

28

outside and tell her grandfather to come inside.  (Id., RT 5563.)  Rather, he testified he told her, "Tell them it will be a minute."  He washed his hands and when he went into his living room, he was surprised to see Leisten standing there.  (Id. RT 5475-5476, RT 5563-5564, RT 5567-5568.)  He testified he asked Leisten what he was doing there, and received the loud and angry questions "What the hell is going on here," "what kind of games . . . are you playing now."  Tedeschi closed the front door and answered that it was Leisten and his daughter who were playing games.  Leisten said Tedeschi owed Shelley money, to which Tedeschi replied Leisten owed him money.[3]  A few more words were exchanged, then Leisten hit him, he hit Leisten back, Leisten grabbed him, he struck back repeatedly, then Leisten hit him again, knocking him to the ground.  (Id., RT 5476, RT 5568.)  He described in detail the physical altercation he contended occurred before the shooting, contrary to Tiffani's testimony no such fight occurred.  (Id., RT 5479, RT 5571-5577.)

Tedeschi testified he then went into another room and "waited momentarily," thinking Leisten was coming after him.  When he thought he saw Leisten's shadow in the hallway, he grabbed a gun out of his gun safe.  He explained the facts the gun safe was already open and the guns loaded, with additional ammunition left on the office floor, as because he had been inventorying his firearms.  (Lodg. 15, Vol. 10, RT 5608-5610.)  He came back into the living room, told Leisten to get out, "and that's when he tried to grab for the gun, and I shot it." (Id. RT 5476-5478, RT 5577-5580.)  He denied intending to shoot anyone, even though he took the safety off on his way back to the living room.  (Id., RT 5604-5606.)  He described how he pointed the gun while telling Leisten to get out, how Leisten tried to grab the gun, and how he raised and pointed it while fanning the trigger several times from a distance of about four or five feet "until Bob Leisten was no longer a threat to me, he wasn't making any more advancement."  (Id., RT 5479-5480, RT 5530-5531, RT 5585-5586).  The firearm discharged a total of three times, but Tedeschi contended he did not recall consciously pulling the trigger.  (Id., RT 5530-5531, RT 5578.)  He testified he "went into  trance," "numb," after he shot Leisten, but he recalled words they exchanged as Leisten went down, and he remembered Tiffani

---

[3] Tedeschi testified he believed Leisten owed Shelley that money, to be paid in lieu of the child support he owed Shelley.  (Lodg. 15, Vol. 10, RT 5553.)  He denied ever making statements or threats about killing Shelley or her parents, contrary to Shelley's testimony and the description by a neighbor of a dispute Tedeschi described with Leisten over money owed for electrical work.  (Id., RT 5550-5554.)

1   screaming "Daddy" and running away.  (Id., RT 5480-5481.)  He recalled hearing sirens, opening the

2   front door, and seeing his neighbor standing on the sidewalk.  (Id., RT 5481).  He characterized the

3   incident as "a very, very tragic misfortune," an "accident" Leisten contributed to.  (Id., RT 5483-5484,

4   RT 5612.)  He stated several times he was afraid of Leisten and feared for his life when he shot him.

5   (E.g., Id., RT 5569.)

6        Tedeschi testified it was only after the SWAT team started firing at him at about 11:30 p.m.

7   that he got a second and a third firearm out of his gun safe, so Tiffani would not have seen any gun

8   other than the one she saw him point at her grandfather.  (Lodg. 15, Vol. 10, RT 5534-5536.)  He

9   denied contemplating suicide, explaining the contents of the notes he wrote as in anticipation the

10   SWAT team or sheriffs were going to kill him.  His request in the good-bye note that Tiffani forgive

11   him referred to the killing of her grandfather, not suicide.  He was referring to Shelley's "lack of

12   communication skills" with him when he wrote "this is the price you pay, Shelley," meaning getting

13   her ex-husband killed.

14        Tedeschi testified he did not know Leisten was dead or dying during the four hours he waited

15   inside his house until the SWAT team's forced entry.  He was not concerned about getting him medical

16   aid  because "I was not aware that Bob Leisten was in grave danger," even though he had been shot

17   at least twice, he was bleeding, he was not moving or speaking, and his eyes were open.  He did not

18   go to a neighbor to get him medical help because "I didn't want to leave Bob Leisten unattended in

19   the house . . . alone" in case he asked for help or wanted to say something.  He heard the police officer

20   knock at his door at about 8:17 p.m., but did not respond because his "interpretation of that was there

21   was a man outside with a gun in his hand," and he has "a paranoia of the Kern County Sheriff's

22   Department."  (Lodg. 15, Vol. 10, RT 5587-5597.)   He explained he said nothing about Leisten

23   having been shot and needing help when he saw Mr. Aragon out front because "I was worried about

24   Tiffan[i]."  (Id., RT 5599.)  He denied punching or kicking Leisten with his work boots when he was

25   down, suggesting the blood got on his boots when he tripped over Leisten's leg returning to the living

26   room after looking outside for Tiffani from his front door.  (Id., RT 5601-5604.)

27        Tedeschi stayed in the hallway "waiting for the police to come into the house and get to Bob"

28

with a loaded gun against his body for protection.  (Lodg. 15, Vol. 10, RT 5615-5616, RT 5600.)

When officers shot tear gas inside, then entered and pepper-sprayed him, he "sarcastically" said to go

ahead and shoot him.  He denied resisting arrest or being assaultive.[4]  (Id., RT 5613-5615.)

**B.    Procedural Background**

Tedeschi pled not guilty to capital murder charges and denied all additional allegations. As

summarized by the Court of Appeal:

> Trial began on February 4, 1999, and, on February 26, 1999, the jury
> found Tedeschi not guilty of first degree murder but guilty of the lesser
> included offense of second degree murder.  The jury found the firearm
> allegation true and the trial court found the lying-in-wait allegation not
> true.  [¶]  On April 9, 1999, the trial court sentenced Tedeschi to prison
> for a total of 25 years to life:  15 years to life for second degree murder,
> plus 10 years for the firearm enhancement.

(Lodg. 4, p. 2.)

Tedeschi appealed his conviction and sentence, alleging several errors associated with

evidentiary issues, jury instructions, and improper custody credit calculations.   (Lodg. 1.)  He also

filed a habeas petition in the Court of Appeal, seeking reversal and a new trial on grounds of

prosecutorial misconduct for failure to disclose material relevant to the impeachment of a government

witness.  (Lodg. 2.)  The Court of Appeal consolidated the direct appeal and the habeas petition and,

on August 8, 2001, affirmed the judgment in its entirety and dismissed the petition.  (Lodg. 4.)  On

October 31, 2001, the California Supreme Court denied his petition for review.  (Lodg. 6.)  Proceeding

*pro se*, Tedeschi initiated several unsuccessful collateral proceedings in the state courts  in 2002 and

2003 seeking relief from his conviction on a variety of theories.

In March 2004, through counsel from the Kern County Public Defender's office, Tedeschi filed

a habeas corpus petition in Superior Court alleging six instances of newly-discovered juror

misconduct.  (Lodg. 9.)   He has been represented by counsel in all subsequent proceedings.  The

Superior Court conducted an evidentiary hearing over two days, April 25-26, 2005, memorialized in

a 202-page transcript.  (Dkt No. 14, Lodg. A, Exh. B; Respondent's Lodgment 16 is an incomplete

transcript of that hearing.)  Each of Tedeschi's twelve jurors provided a declaration and also testified

---

[4] A SWAT team member testified he pepper-sprayed Tedeschi because he was resisting arrest,
and it took several of the men to subdue him.  (Lodg. 15, Vol. 10, RT 5624-5635.)

at the hearing regarding the conduct of their deliberations at the trial six years earlier.  In its July 6, 2005 ruling denying the petition, the Superior Court found insufficient evidence to support three of the six juror misconduct claims, but found  Tedeschi's jurors committed the other three alleged acts of misconduct.  However, the court found for each instance of misconduct, the evidence presented rebutted any presumption of resulting prejudice.  (Lodg. 10.)  Tedeschi filed a petition in the Court of Appeal on August 9, 2005 challenging the denial of relief on the three instances of misconduct the Superior Court had found true.  (Lodg. 11.)  The Court of Appeal summarily denied that petition on December 22, 2006.

        On February 28, 2007, the California Supreme Court granted review, and referred two of the three issues presented in the habeas petition back to the Court of Appeal.  The Court of Appeal instructed the parties to provide supplemental briefing:

> Our Supreme Court has held that "when [juror] misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be non-prejudicial.  The verdict will be set aside only if there appears a substantial likelihood of juror bias."  (*In re Carpenter* (1995) 9 Cal.4th 634, 653.)  Juror bias may appear if either (1) the extraneous material itself was " 'inherently prejudicial' " or (2) the nature of the misconduct and the surrounding circumstances indicated it is substantially likely that a juror was actually biased.  (*Ibid.*)  As to the second test, " the 'entire record' logically bearing on a circumstantial finding of likely bias includes the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant." (*Id.* at p. 654.)  Assuming *In re Carpenter* sets forth the standards applicable to this case, **what specific portions of the trial record support a determination under those standards that there is/is not a substantial likelihood of juror bias arising from the misconduct in the receipt of extraneous material**?

(Lodg. 12, pp. 9-10 (emphasis added).)

        In its unpublished 23-page Opinion issued January 17, 2008, after hearing oral argument on November 26, 2007 following the supplemental briefing, the Court of Appeal summarized:

> A jury convicted petitioner Mark Vincent Tedeschi of second degree murder for the shooting death of his ex-father-in-law.  Five years later, Tedeschi petitioned for a writ of habeas corpus in the trial court seeking a new trial based on alleged instances of juror misconduct during deliberations.  Following an extensive hearing, the trial court found three instance of juror misconduct occurred during

1    deliberations but determined the presumption of prejudice arising from
     the misconduct had been rebutted. Tedeschi sought review of the trial
2    court's ruling by filing the instant petition for writ of habeas corpus.
     We originally denied the petition. **The [California] Supreme Court**
3    **subsequently granted review, and transferred the matter to us with**
     **directions to vacate our summary denial and to issue an order**
4    **showing cause why Tedeschi was not entitled to relief based on two**
     **of the three instances of juror misconduct found by the trial court,**
5    **namely, "(1) considering an extrajudicial definition of 'malice,' and**
     **(2) discussing whether [Tedeschi] had been previously tried, and**
6    **whether retrial was barred if the jury failed to reach a verdict...."**
     **Tedeschi contends the trial court erred in concluding that the**
7    **presumption of prejudice arising from these instances of**
     **misconduct had been rebutted, and that he is entitled to a new trial.**
8    **We disagree, and deny his petition.**

9    (Lodg. 12, p. 2 (emphasis added).)

10        The California Supreme Court summarily denied Tedeschi's Petition For Review of that result

11   on March 26, 2008, noting one justice thought the petition should be granted.  (Lodgs. 13, 14).

12        Tedeschi contends in his June 12, 2008 federal Petition he is unlawfully incarcerated because

13   the three instances of jury misconduct found by the Superior Court deprived him of his federal due

14   process rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution

15   to a unanimous and fair jury, to confront witnesses, and to effective assistance of counsel.  (Pet. 4:8-

16   14; *see* Pet. P&A 2:5-11.)   Respondent raises no untimeliness or procedural bar to this Court's

17   consideration of Tedeschi's constitutional claims.

18   **II.      DISCUSSION**

19            **A.      <u>Legal Standards</u>**

20        A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person

21   in custody pursuant to the judgment of a State court only on the ground he is in custody in violation

22   of the Constitution or laws or treaties of the United States."  28 U.S.C.A. § 2254(a).  Only errors of

23   federal law can support intervention in state proceedings.  <u>Oxborrow v. Eikenberry</u>, 877 F.2d 1395,

24   1400 (9th Cir. 1989).  Federal habeas courts are bound by a state's interpretations of its own laws.

25   <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991); <u>Himes v. Thompson</u>, 336 F.3d 848, 852 (9th Cir. 2003).

26        Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and

27   Effective Death Penalty Act of 1996 ("AEDPA").  AEDPA establishes a " 'highly deferential standard

28

for evaluating state-court rulings,' " requiring "that state-court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (*per curiam*), *quoting* Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997).  A federal court can grant a prisoner habeas relief only if it determines the result of a claim adjudicated on the merits by a state court "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see* Bell v. Cone, 535 U.S. 685, 694 (2002); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  A state court's decision is "contrary to" clearly established federal law if it (1) applies a rule that contradicts governing Supreme Court authority, or (2) "confronts a set of facts that are materially indistinguishable from" a Supreme Court decision but reaches a different result.  Early v. Packer, 537 U.S. 3, 8 (2002), *quoting* Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  To be found "unreasonable," the application of the precedent "must have been more than incorrect or erroneous;" it "must have been 'objectively unreasonable.' " Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citation omitted); *see also* Middleton v. McNeil, 541 U.S. 433, 436 (2004) (*per curiam*).

A state court's findings of historical fact are presumed correct.  28 U.S.C. § 2254 (e)(1); *see* Dickson v. Sullivan, 849 F.2d 403, 405 (9th Cir. 1988).  However, the conclusion that a "constitutional error was harmless does not constitute a factual finding entitled to a presumption of correctness." Dickson, 849 F.2d at 405 ("The question whether [extraneous information] prejudiced [the defendant] requires the application of a legal standard to historical facts," and is "thus a mixed question of law and fact reviewable *de novo*"); *see*  Sassounian v. Roe. 230 F.3d 1097, 1108 (9th Cir. 2000) ("Juror misconduct is a mixed question of law and fact, reviewed de novo"); *see also* Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995) (federal courts review a state court's finding of "no prejudice" *de novo*).

A federal habeas court applying those standards looks to the last reasoned state court decision. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); *see* Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991).  The denial of a petition by the state's highest court "without comment or citation constitute[s] a decision on the merits of the federal claims . . . subject to review in federal habeas

proceedings." <u>Hunter v. Aispuro</u>, 982 F.2d 344, 347-48 (9th Cir. 1992).  The reasoned decision under review here on two of the three claims in the Petition  is the January 17, 2008 Court of Appeal's second denial of Tedeschi's habeas petition.  (Lodg. 12.)  Rejection of Tedeschi's third juror misconduct claim was not disturbed by proceedings subsequent to the Superior Court's July 6, 2005 denial of his habeas petition, the last reasoned decision on that issue, finding the misconduct but no prejudice.  (Lodg. 10.)

     **B.**    <u>**Juror Misconduct Was Not Prejudicial**</u>

     **1.**    <u>**Federal Standard And Permissible Evidentiary Inquiry**</u>

     The Sixth Amendment guarantee of a fair trial before a panel of impartial jurors requires that the verdict be based on the evidence presented at trial.  <u>Turner v. Louisiana</u>, 379 U.S. 466, 471-73 (1965).  Exposure to facts not in evidence can deprive a defendant of the Sixth Amendment rights to confrontation, cross-examination, and assistance of counsel.  <u>Dickson</u>, 849 F.2d at 404, 406.  "Juror misconduct typically occurs when a member of the jury has introduced into its deliberations matter which was not in evidence or in the instructions."  <u>Thomas v. Borg</u>, 74 F.3d 1571, 1574 (9th Cir. 1996); *see also* <u>Jeffries v. Blodgett</u>, 5 F.3d 1180, 1190-91 (9th Cir. 1993) (vacating a grant of summary judgment and remanding for factual determinations as to the truth of two jurors' affidavits concerning misconduct during a trial two years earlier associated with the highly inflammatory nature of certain jurors' exposure to extrinsic evidence of the defendant's substantially similar prior bad acts).

     Nevertheless, "[d]ue process does not require a new trial every time a juror has been placed in a potentially compromising position."  <u>Smith v. Phillips.</u> 455 U.S. 209, 217 (1982) ("Due process merely means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen").  Federal habeas relief is warranted only if the petitioner establishes both that constitutional error occurred and that the error had "substantial and injurious effect or influence in

determining the jury's verdict."[5] <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 627, 635-38 (1993) (rejecting

the "harmless beyond a reasonable doubt" standard of <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967)

on collateral review). The <u>Brecht</u> Court adopted the harmless-error standard of <u>Kotteakos v. United</u>

<u>States</u>, 328 U.S. 750, 776 (1946):

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

<u>Kotteakos</u>, 328 U.S. at 765, 776 (finding it "highly probable that the [trial] error had substantial and

injurious effect or influence in determining the jury's verdict"and reversing a judgment).

    In determining the prejudicial effect of information improperly introduced into jury

deliberations, courts "place great weight on the nature of the extraneous information that has been

introduced" because "[n]o bright line test exists to assist courts in determining whether a petitioner

has suffered prejudice from juror misconduct." <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 950 (9th Cir.

2002) (citations omitted). Thus, while the jury's consideration of extraneous information in convicting

a defendant may violate the defendant's federal constitutional rights, it is a trial error subject to

harmless error analysis on habeas review. <u>Id.</u> at 949-50, 953 (the reviewing court inquires "whether

there was a direct and rational connection between extrinsic material and the prejudicial jury

conclusion, and whether the misconduct relates directly to a material aspect of the case") (citations

omitted); <i>see also</i> <u>Fry v. Pliler</u>, 551 U.S. 112, 119-20 (2007) (holding that harmless error analysis is

still required after a showing that the state court opinion was contrary to or involved an unreasonable

application of clearly established federal law because Section 2254(d) "sets forth a precondition to the

---

[5] "[T]he standard for determining whether habeas relief must be granted is whether [the constitutional error] 'had substantial and injurious effect or influence in determining the jury's verdict' " because that standard "is better tailored to the nature and purpose of collateral review than the <u>Chapman</u> standard, and application of a less onerous harmless-error standard on habeas promotes the considerations underlying our habeas jurisprudence." <u>Brecht</u>, 507 U.S. at 623; <i>see</i> <u>Bains v. Cambra</u>, 204 F.3d 964, 976-77 (9th Cir. 2000) ("we now join the vast majority of our sister circuits by deciding that the <u>Brecht</u> standard should apply uniformly in all federal habeas corpus cases under § 2254"). Although <u>Brecht</u> pre-dated AEDPA, the "substantial and injurious effect" test remains the standard. <i>See</i> <u>Sassounian</u>, 230 F.3d at 1111-12, <i>quoting</i> <u>Kotteakos</u>, 328 U.S. at 765.

08cv0820

grant of habeas relief, . . . not an entitlement to it").

The prejudice determination is made in consideration of all the circumstances of the trial.[6] Sassounian, 230 F.3d at 1109.  "The relevant inquiry is whether the [error] actually harmed the appellant" by causing a " 'substantial and injurious effect or influence in determining the jury's verdict,' . . . or . . . the judge 'is in grave doubt' about the harmlessness of the error."  Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004), *quoting* Brecht, 507 U.S. at 637 *and* O'Neal v. McAninch, 513 U.S. 432, 436 (1995); *see also* Mancuso, 292 F.3d at 949 & n.4 (same).

> The Supreme Court has made clear that whether a trial error had a substantial and injurious effect is not to be analyzed in terms of burdens of proof. . . . We, as the reviewing court, have the responsibility to determine this legal question "without benefit of such aids as presumptions or allocated burdens of proof that expedite factfinding at trial." [7]

Mancuso, 292 F.3d at 950, *quoting* O'Neal, 513 U.S. at 436 ("Do [we, the judges on habeas review], think that the error substantially influenced the jury's decision?"); *see also* Simmons v. Blodgett, 110 F.3d 39, 41-42 (9th Cir. 1997) ("Finding facts to determine if there is a constitutional error is a wholly different thing from deciding whether or not an error, once found, affected the verdict).

"Before turning to the merits, we must determine what evidence may be considered in evaluating the jury's consideration of the improper evidence."  Sassounian, 230 F.3d at 1108.  A jury's deliberative process is not reviewable unless the allegation asserts extraneous prejudicial information

---

[6]  Sassounian, 230 F.3d at 1109 (holding analysis of the factors relevant to whether improper evidence was considered by the jury, excluding "the subjective impact" of improperly admitted evidence, "compels the conclusion that the fact that four jurors recalled discussing the [extrajudicial evidence of a phone call], when and how it occurred, the nature of the extrinsic evidence it introduced into the deliberations and the weakness of the trial evidence bearing on the special circumstance, had a 'substantial and injurious effect or influence' on the special circumstance finding").  The prejudicial error occurred in that case because the jury's considered a phone call not in evidence that provided probative evidence of the defendant's nationality-based motive for a killing:  "Here, when all is said and done, these simple facts remain:  after fifteen days of deliberation the jury was hung on each of the special circumstances.  Then, in response to Juror Rankin's searching question for the 'reason' for the killing, the improper extrinsic evidence was introduced into the deliberations.  Within one hour, the jury found true the special circumstance of murder because of nationality or national origin but hung on each of the other charged circumstances."  Id., at 1111-12.

[7]  The Mancuso court observed Ninth Circuit decisions have not consistently interpreted or applied the Brecht standard, citing examples.  Some cases state the petitioner bears the burden of showing a trial error had a substantial and injurious effect.  Other cases state the government bears the burden to show it did not.  That court concluded the statement of the Brecht standard most accurately reflecting current Supreme Court case law to be:  "the reviewing court must determine independently whether a trial error had a substantial and injurious effect, without consideration of burdens of proof."  Mancuso, 292 F.3d at 949 n.4.

08cv0820

1    was brought to the jurors' attention.  *See* <u>Tanner v. United States</u>, 483 U.S. 107, 121 (1987) (exception

2    to the common-law rule prohibiting admission of juror testimony to impeach a jury verdict recognized

3    for juror testimony relating to extraneous influences).  Federal Rule of Evidence 606(b) embodies that

4    exception,[8] and applies to petitions for a writ of habeas corpus from state prisoners pursuant to FED.

5    R. EVID. 1101(e).  "[F]ederal courts can consider 'juror testimony about the consideration of extrinsic

6    evidence' but cannot consider testimony 'about the subjective effect of evidence on the particular

7    juror."  <u>Fields v. Brown</u>, 503 F.3d 755, 798 (9th Cir. 2007), (Berzon, J., dissenting), *cert. denied sub*

8    *nom* <u>Fields v. Ayers</u>, -- U.S. --, 128 S.Ct. 1875 (Apr. 14, 2008), *quoting* <u>Sassounian</u>, 230 F.3d at 1108

9    (discussing FED.R.EVID 606(b)).

10   "A long line of precedent distinguishes between juror testimony about the consideration of

11   extrinsic evidence, which may be considered by a reviewing court, and juror testimony about the

12   subjective effect of evidence on the particular juror, which may not."  <u>Sassounian</u>, 230 F.3d at 1108-

13   09; *see* <u>Dickson</u>, 849 F.2d at 406  ("the question of prejudice is an objective, rather than a subjective,

14   one," and "[a] trial judge should not investigate the subjective effects of any [extrinsic evidence] upon

15   the jurors") (citations omitted); <u>United States v. Bagnariol</u>, 665 F.2d 877, 884-85 (9th Cir. 1981)

16   ("Jurors may testify regarding extraneous prejudicial information or improper outside influences, [but

17   they] may not be questioned about the deliberative process or subjective effects of extraneous

18   information, nor can such information be considered by the trial or appellate courts").

19   Factors a reviewing court considers, based on objective evidence associated with the jury

20   deliberations, to determine whether introduction of extrinsic information resulted in reversible

21   constitutional error include:

22

---

23       [8] "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter
or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any

24   other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or
concerning the juror's mental processes in connection therewith.  But a juror may testify about (1) whether
extraneous prejudicial information was improperly brought to the jury's attention. . . . A juror's affidavit or

25   evidence of any statement by the juror may not be received on a matter about which the juror would be
precluded from testifying."  FED. R. EVID. 606(b); *see* <u>United States v. Rutherford</u>, 371 F.3d 634, 644 (9th Cir.

26   2004) (explaining that under Rule 606(b), "a juror cannot testify to whether an outside influence *caused* him

27   to change his vote from innocent to guilty").  California also frames the inquiry into the validity of a verdict
as permitting only objective consideration of the character of evidence as likely or not to have improperly

28   influenced the verdict.  *See* CAL. EVID. CODE § 1150.

(1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the extrinsic material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the introduction of extrinsic material affected the verdict.

Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir. 1986); *see* Dickson, 849 F.2d at 406; Marino v. Vasquez, 812 F.2d 499, 506 (9th Cir. 1987).   Other considerations include:

1.   whether the prejudicial statement was ambiguously phrased; 2. whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; 3. whether a curative instruction was given or some other step taken to ameliorate the prejudice; 4. the trial context; and 5. whether the statement was sufficiently prejudicial given the issues and evidence in the case.

United States v. Keating, 147 F.3d 895, 902-03 (9th Cir. 1998) (footnote omitted), *quoting* Jeffries, 114 F.3d at 1491-92.

**2.      Jury Misconduct Evidentiary Hearing And Subsequent Rulings**

The Supreme Court has long held that "the remedy for allegations of jury partiality is a hearing in which the defendant has the opportunity to prove actual bias." Smith v. Phillips, 455 U.S. 209, 215 (1982).   The Superior Court held an evidentiary hearing on April 25-26, 2005 associated with Tedeschi's habeas petition alleging six newly-discovered instances of juror misconduct during deliberations. (Lodg. 12, p. 8; *see* Lodg. 9.)   Tedeschi does not challenge the fullness or fairness of that hearing.   The 202-page transcript of the two-day hearing is provided in its entirety as Exhibit B to Lodgment A filed concurrently with Tedeschi's Traverse.   (Dkt No. 14.)   The lodgments also include copies of the Declarations each juror provided in advance of their testimony.   Prior to calling each witness, the court ruled on objections, properly striking those portions of each declaration describing the declarant's subjective reasoning or mental processes affecting his or her vote in reaching the verdict or speculating about what other jurors were thinking.[9]   (*See, e.g.*, Dkt 14, Lodg. A, Exh. B, RT 53:19-54:12, RT 101:24-28; RT 126:22-24; RT 136:25-137:1; RT 152:15-21.)   Each of Tedeschi's jurors then testified, as pertinent here, albeit most with an understandable lack of

---

[9]   "No evidence is admissible to show the *effect* of such statement, conduct, admission or event upon a juror either in influencing him to assent to or to dissent for [*sic*] the verdict or concerning the mental process by which it was determined." (Lodg. A, Exh. B, RT 47:9-14, CAL. EVID. CODE § 1150(a); *see* fn 9, above.)

recollection of specifics given the intervening six years since the February 1999 trial, regarding: (1) whether they recalled a fellow juror sharing an extra-judicial definition of malice he had looked up in a dictionary; (2) whether they recalled jurors discussing whether Tedeschi had been tried before for the crime and what might happen if their jury "hung;" and (3) whether they recalled jurors discussing punishment during deliberations. The court heard counsel's closing arguments on June 29, 2005, then issued its written ruling on July 6, 2005, finding those three of the six alleged instances of juror misconduct occurred, but did not prejudice the result, and denying Tedeschi's habeas petition.

> **The court notes that the misconduct** in numbers 4, 5, and 6 above [*i.e.*, jury discussion of a previous trial and effect if they failed to reach a verdict, jury discussion of punishment during guilt deliberations, and an extraneous definition of malice] **did not affect the rights of the defendant and did not improperly influence or affect the jury as a whole or any one juror individually**. This is true whether one considers the acts of misconduct individually or as a whole. **No real or actual bias was displayed by any of the jurors, even those who committed the misconduct.** It must be understood that in reviewing the entire case and weighing the misconduct, the evidence was _overwhelming_ that at a minimum the defendant was guilty of at least second degree murder. Any evidence to suggest otherwise was simply not credible.

(Lodg.10, p. 4 (bolded emphasis added).)

The California Supreme Court vacated the Court of Appeal's summary denial of relief from that result. After soliciting additional briefing from the parties on instructions from the California Supreme Court to conduct additional proceedings associated with two of the three instances of juror misconduct, in its reasoned Opinion entered January 17, 2008, the Court of Appeal applied the two tests of In re Carpenter, 9 Cal.4th 634, 653, 654 (1995) (reviewing the effects of misconduct involving jurors' receipt of information from extraneous sources, citing United States Supreme Court authority, and holding "judgment must be set aside if the court finds prejudice under either test"). (Lodg. 12, pp. 1-2.) Under Carpenter, before a unanimous verdict is set aside for juror misconduct., the likelihood of juror bias must be substantiated under either the "inherent" bias test (finding bias if the extraneous material is inherently and substantially likely to have influenced the juror) or the "actual" bias test (looking to the nature of the misconduct and surrounding circumstances to determine whether

1    it is substantially likely the juror was actually biased against the defendant).[10]

2          Under this second, or "circumstantial," test, the trial record is not a
      dispositive consideration, but neither is it irrelevant. **All pertinent**
3     **portions of the entire record, including the trial record, must be**
      **considered**. The presumption of prejudice may be rebutted, *inter alia*,
4     by a reviewing court's determination, *upon examining the entire record*,
      that there is no substantial likelihood that the complaining party
5     suffered actual harm.

6    Carpenter, 9 Cal.4th at 654 (bolded emphasis added) (citation omitted).

7          **3.      Improper Exposure To Extrajudicial "Malice" Definition Had No**
                 **Substantial Or Injurious Effect On Verdict**

8          The jury began its deliberations at 10:20 a.m. on February 25, 1999, took a one-hour break for

9    lunch, adjourned at 4:30 p.m., then reconvened to resume deliberations on February 26, 1999 at 9:01

10   a.m.  (Lodg. 12, p. 10 .)

11         At 12:25 p.m. [on the second day], the jury returned to the courtroom
12    and the trial court responded to a note from the jury foreperson asking
      the court to explain "malice."  The court told the jurors it could not tell
13    them anything more about "malice" except what was in the instructions.
      The foreperson then asked whether the court could give the jury a law
14    dictionary.  **The court said no and reiterated that the jury was**
      **required "to follow the instructions, the definition of malice."**  The
15    foreperson then stated, "I guess we weren't satisfied with the definition
      as stated in the papers you gave us."  The court responded, "But that is
16    the definition."  The foreperson replied, "That is the definition?"  **The**
      **court repeated, "That is the definition."**  [¶]  Following this
17    discussion, the jury broke for lunch at 12:30 p.m.  At 1:30 p.m., the
      jury retired to deliberate further.  After taking a 15 minute break at
18    2:58, the jury returned its verdict at 4:03 p.m.

19   (Lodg. 12, p. 10 (emphasis added).)

20         The Court of Appeal summarized the misconduct:

21         [E]vidence was presented [at the evidentiary hearing] that on the
      second day of jury deliberations in Tedeschi's trial, one of the jurors
22    told the jury he had gone to the library over the lunch hour and
      obtained a dictionary definition of "malice," and then shared this
23    definition with the jury.  The juror who brought the dictionary

24   _____

25         [10]  The Court of Appeal also discussed Marino, 812 F.2d 499 by way of "example" at Lodgment 12,
      pp. 18-19, in revisiting the two remanded juror misconduct issues.  *See* Marino, 812 F.2d at 504 & n.5 (granting
26    conditional habeas relief from convictions for second degree murder and attempted murder, finding a reasonable
      possibility the defendant suffered prejudice as a result of two errors:  (1) conducting an out-of-court experiment
27    with a third party; and (2) introduction of an unauthorized dictionary definition of an element of the crime
      ("malice") during deliberations).  The Marino case pre-dates AEDPA and  the adoption in Brecht of the
28    Kotteakos harmless-error standard, applying instead the Chapman standard, which required the prosecution to
      prove that constitutional errors were harmless beyond a reasonable doubt.

                                    - 21 -                                    08cv0820

> definition of "malice" into the jury room never admitted to the conduct.
> Although other jurors' descriptions of the juror pointed to Juror No.
> 044400 as being the likely culprit, Juror No. 044400 denied that it was
> him and then testified he could not remember doing it.

(Lodg. 12, p. 11.)

The Court of Appeal identified its task as "to decide . . . whether the juror misconduct in considering an extrajudicial definition of 'malice' was prejudicial."  (Lodg. 12, p. 16.)

> "This standard is well established.  '[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial.  **The verdict will be set aside only if there appears a substantial likelihood of juror bias**.. . .' "

(Lodg. 12, pp. 16-17 (bolded emphasis added), *quoting* <u>People v. Danks</u>, 32 Cal.4th 269, 303 (2004), *quoting* <u>Carpenter</u>, 9 Cal.4th at 653.)

"The concept of malice goes to the very heart of the deliberative process of a jury in a murder case."  <u>Marino</u>, 812 F.2d at 506.  Tedeschi contends:  "during deliberations, the jurors improperly discussed at length an extra-record definition of the term 'malice,' brought to the deliberations by a juror who looked up the definition in the library during a break."  (Pet. 5:12-14.)  "This misconduct occurred **immediately after** the jurors had asked the court for a definition of the term 'malice,' and the court had **refused** to give any definition beyond the jury instructions already given."  (<u>Id.</u> at 5:14-16.)  "This misconduct is specifically attested to by at least six jurors," and "[n]ot a single juror averred that this did **not** happen."  (<u>Id.</u> at 5:16-18.)  He urges the Court to find a "direct and causal connection between the extrinsic material and a prejudicial jury conclusion."  (Pet. P&A 11:7-8, quoting <u>Marino</u>, 812 F.2d at 506.)  However, the <u>Marino</u> case is distinguishable.  That court granted habeas relief on murder and attempted murder convictions because a juror changed his vote to guilty after holding out for nearly 30 days against a guilty verdict, evidencing a direct temporal and causal connection between extraneous evidence and a prejudicial result.  In addition, the extrinsic definition in that case was known to have been materially different from the jury instruction definition of "malice."

> As to the dictionary definition [of "malice"], the record here supports the conclusion that there was both **a direct connection between the extrinsic material and the jury's verdict**, **as evidenced by** the

08cv0820

holdout juror's change of verdict, and misconduct relating to a material aspect of the case, the definition of the element of malice. . . . **In the case at bar the presence or absence of malice was pivotal, as there were no issues as to mistaken identity, causation, or diminished capacity**. . . .   There is a rational connection between the kind of extrinsic evidence introduced, relating to the credibility of a defense of self-defense, and a verdict of guilty of second degree murder.

Marino, 812 F.2d at 506 (emphasis added).

"[T]here is no dispute in this case that juror misconduct occurred when a juror obtained a dictionary definition of 'malice' and shared it with the jury during deliberations." (Lodg. 12, pp. 15-16.)  "Jurors are not allowed to obtain information from outside sources either as to factual matters or for guidance on the law."  (Resp. Lodg. 12, p. 16, *quoting* People v. Karis, 46 Cal.3d 612, 642 (1988).  Nevertheless, Respondent contends no "substantial and injurious influence" on the verdict resulted in light of the Superior Court's factual finding the extra-record definition was similar to the jury instruction definition "and the overwhelming evidence establishing Petitioner's guilt of at least second degree murder," so that "the state court's rejection of this claim was not an unreasonable application of Brecht" because:  the "misconduct in this regard was minimal; the extra-record definition was apparently similar to the legal one; and the jurors did not make much use nor remember this fact as being significant." (Answer 22:7-9 & p. 24.)  As summarized by Respondent:

> **This murder case was in essence a credibility contest between the only two living witnesses to the events leading to the death of the victim**.[]  Tiffani Tedeschi testified that the Petitioner shot the victim in an unprovoked attack after the victim entered Petitioner's home to pick her up.  Petitioner, on the other hand, told a completely different story in which he was the victim of an aggressive attack by the victim and fearing for his safety he shot the victim in self-defense.  Under Tiffani's scenario of the events Petitioner would be guilty of either first or second degree murder and under Petitioner's version he would either be acquitted if the jury found he actually and reasonably feared for his safety or he would be guilty of voluntary manslaughter if the jury believed his story but did not find his honest belief in the need to defend himself reasonable under the circumstances.  **Thus, the key issues in this case were ones of credibility and the physical evidence that supported or refuted the very different versions told by these two witnesses**.
>
> The jury's interest in the term "malice," although highlighted by Petitioner, does not, upon examination of the record and the instructions given appear to be a crucial matter.  **If the jury believed the story told by Tiffani Tedeschi then Petitioner was guilty of murder under any definition of malice supplied by the parties**. . . .

08cv0820

> All the definitions supplied by the parties [at the evidentiary hearing, obtained  from a variety of dictionaries in libraries accessible to the jury] focus on an intent to harm another.  Clearly under Tiffani's version, an intent to harm the victim was present.[11]

(Answer p. 24 & n.5 (emphasis added).  As emphasized by the prosecutor in closing argument: "[t]here is no making these fit, ladies and gentlemen.  One of these two is lying.  And there is no reconciling the testimony."[12]  (Lodg. 15, Vol. 11, RT 5821.)

The lowest common denominator of the "malice" definitions from all likely dictionary sources researched by the parties for the evidentiary hearing,[13] as well as of CALJIC 8.11, is intent to harm.

> "Malice"' may be either express or implied. [¶]  [Malice is express when there is manifested an intention unlawfully to kill a human being.] [¶] [Malice is implied when: [¶] 1. The killing resulted from an intentional act; [¶] 2.  The natural consequences of the act are dangerous to human life; and [¶] 3.  The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.]  [¶]  [When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.]  [¶]  The mental state constituting malice aforethought does not necessarily require any ill will or hatred fo the person killed. [¶]  The word "aforethought" does not imply deliberation or the lapse of considerable time.  It only means that the required mental state must

---

11   Respondent also contends " 'malice' would still be present under CALJIC No. 8.11 or any other definition of malice provided *if* that instruction was [*sic*] viewed in isolation and the jury disbelieved Tiffan[i] and instead credited Petitioner's version of the events.  Under that version Petitioner honestly believed that the victim was a threat to him and he acted in response to that threat.  However, he clearly meant to do harm to the victim even under a self-defense theory.  Malice in that situation would not be negated by referring to any instruction on that legal term but rather by reference to the instructions as a whole and in particular the instructions on perfect and imperfect self defense which the jury was given.  This is precisely what counsel for Petitioner argued to the jury.  (*See* RT 5883-87.)  [¶]  These self defense instructions, and not any instructions on the term 'malice,' were the crucial ones for Petitioner's defense."  (Answer 25:1-11.)

12   Tedeschi criticizes the characterization of the evidence as "overwhelmingly" against him: "Total acquittal as to first-degree murder is the jury's rejection of this 'overwhelming' case."  (Traverse 30:9-10.)  Contrary to the jurors' testimony at the evidentiary hearing, he attempts to describe their deliberations: "Again, having **rejected** every theory of first-degree murder, the jury was left to consider **only** the difference between second-degree murder and manslaughter:  malice, the very concept which lies at the heart of the jury misconduct in this case."  (Traverse 31:9-11, followed by a series of speculative rhetorical questions about what an "untainted jury" might have concluded.)

13   As summarized by the Court of Appeal: "The prosecution and defense investigators attempted to ascertain which dictionary definition of 'malice' might have been brought into the jury room by investigating dictionaries kept in the law library of the superior court and the public library near the court. The parties presented the trial court with various examples of definitions culled from these dictionaries, which included both legal and common definitions of the term 'malice.'  None of these, however, was established to be the actual definition that was brought into the jury room."  (Resp. Lodg. 12, p. 12.)  The various definitions with their sources are provided as part of the Traverse lodgments

- 24 -

1    precede rather than follow the act.

2    (CALJIC 8.11; Lodg. 12, p. 19, n. 3; Lodg. 17, Clerk's Transcript ("CT") 1194.)

3        Malice is a required element of first- and second-degree murder, but not of the lesser-included

4    offenses of voluntary or involuntary manslaughter, on which the jury was also instructed.  Under

5    California law, the element of malice is negated if one kills out of fear of imminent peril.  Middleton,

6    541 U.S. at 434.  Unlike the Marino case, where "the presence or absence of malice was pivotal"

7    (Marino, 812 F.2d at 506), from the testimony of Tedeschi's jurors at the evidentiary hearing, their

8    sticking point was whether to convict of first-degree murder (favored initially by a 10-to-2 margin)

9    or second-degree murder, not whether to convict of murder or manslaughter or whether to acquit .

10       The Court of Appeal found under the first Carpenter test that the extraneous information,

11   objectively viewed, was not "inherently and substantially likely to have influenced the juror since we

12   do not know what the extraneous information actually was."  (Lodg. 12, p. 17 (only "minimal

13   information about the extrajudicial definition of 'malice' brought into the jury room,"  and "[n]one of

14   the jurors could remember any specific details of the definition," with "one juror believ[ing] it was

15   similar to the one given in the jury instructions," testimony "the trial court apparently found . . .

16   credible").)

17       Under the second Carpenter test, the Court of Appeal considered the entire record to conclude

18   "we cannot find that actual bias nonetheless arose."  (Lodg. 12, p. 17.)  "In an extraneous-information

19   case, the 'entire record' logically bearing on a circumstantial finding of likely bias includes the nature

20   of the juror's conduct, the circumstances under which the information was obtained, the instructions

21   the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against

22   the defendant."  (Id., *quoting* Carpenter, 9 Cal.4th at 654 ("For example, the stronger the evidence, the

23   less likely it is that the extraneous information itself influenced the verdict").)

24           Without question, the juror's conduct in this case was troubling,
         i.e., consulting a dictionary for the definition of an essential element of
25       the charged crime and sharing it with the rest of the jury, shortly after
         the trial court clearly referred the jury back to the instructional
26       definition of "malice" and declined the foreperson's request for a law
         dictionary.  The presence, absence, or negation of "malice" was
27       undeniably a key issue in the case and in the juror's assessment of the
         various theories of liability presented to them.  As Tedeschi points out,

28

the jury was instructed, among other things, that "[t]he distinction between murder and manslaughter is that murder requires malice while manslaughter does not."

Nonetheless, these circumstances alone do not establish a substantial probability that one or more jurors was actually biased against Tedeschi as a result of the juror misconduct. We are unconvinced by the main thrust of Tedeschi's prejudice argument which is that the introduction of the extrajudicial definition of "malice" into deliberations, in his words, "operated to lighten the People's burden by removing the **true** legal definition of ["malice"] from the equation." The record does not disclose what dictionary definition of "malice" was shared with the jury, and, in contrast to some of the cases Tedeschi cites, his suggestion that the jury likely disregarded the legal definition of "malice" provided by the court in favor of the unknown extrajudicial definition is based largely on speculation about the timing of the verdict rather than on objective evidence indicating the jury was actually influenced by the extrajudicial definition.

(Lodg. 12, pp. 17-18, *distinguishing* Marino, 812 F.2d 499, *and distinguishing* Glage v. Hawes Firearms Co., 226 Cal.App.3d 314 (1990) (reversing a judgment when the legal definition of "preponderance" in the "preponderance of the evidence" phrase differed from the common meaning of "preponderance" two jurors looked up in a dictionary, finding the misconduct was prejudicial because of the "quantity" connotation in the various common definitions, as distinct from the "quality" of evidence meaning in the legal phrase, creating a "substantial likelihood" the jury was improperly and prejudicially influenced by the dictionary definition); *see also* Sassounian, 230 F.3d at 1110.[14]

The Court of Appeal concluded "there is no clear indication that the introduction of the extrajudicial definition of 'malice' directly resulted in one or more jurors changing their votes to Tedeschi's detriment, or caused the jury to reject the proper legal definition in favor of a common

---

[14]  The improper information here is distinguishable from the improper information introduced to the Sassounian jurors resulting in a finding of substantial prejudice, as are the circumstances. The Sassounian jury had informed the court after 15 days of deliberations it could arrive at a verdict, but could not agree on any of the charged special circumstances. "The jury was sent back to the jury room at 2:40. It was during the next hour, before the verdict was returned at 3:50 p.m., that the jury discussed the phone call as the reason the Turkish Consul was killed . . . . [C]ompelling is the fact that the evidence was discussed in response to Juror Rankins' question based on the jury instruction about the 'most reasonable reason' for the killing. The improper phone call 'evidence' thus supplied the 'reasonable reason' Juror Rankins needed to convict." Sassounian, 230 F.3d at 1110. "The phone call directly related to Sassounian's motive, which was at issue in the special circumstance for which he was convicted," and "[i]t cannot be said that the other evidence amassed at trial was so overwhelming that the jury would have reached the same result even if it had not considered the extraneous material," because the other evidence related to the special circumstance was all either circumstantial or challenged at the trial. Id. at 1110-1111. In Tedeschi's case, his daughter witnessed the killing and testified regarding the circumstances leading up to the murder which, if believed over Tedeschi's inconsistent trial testimony at crucial junctures, provides the "overwhelming" direct evidence he committed a murder.

1   meaning of the term." (Lodg. 12, p. 20.)

2           Instead, Tedeschi asks us to speculate that the jury's dissatisfaction with
3           the instructional definition of "malice" was the single issue holding up
            the verdict, and that the jury was able to return a verdict relatively
            quickly after the jury misconduct occurred because it found some
4           guidance in the extrajudicial definition of "malice." [¶] The standard
            of review articulated by our Supreme Court requires more than
5           speculation.  "We emphasize that before a unanimous verdict is set
            aside, the likelihood of bias under either test must be *substantial*."

6   (Lodg. 12, p. 20, *quoting* <u>Carpenter</u>, 9 Cal.4th at 654.)

7        The Court of Appeal found "[a] number of circumstances, revealed by our review of the record,
8
    support the trial court's conclusion that the jury's receipt of the extrajudicial definition of 'malice' was
9
    nonprejudicial."  (Lodg. 12, pp. 20-21.)
10
11          A majority of jurors had no recollection of the incident.  There is also
            no evidence the juror mentioned the extrajudicial definition of "malice"
            more than once or that it engendered lengthy discussion or debate
12          among the jurors.  As noted above, the trial court credited juror
            testimony that the discussion was brief.
13
    (Lodg. 12, p. 21, distinguishing <u>People v. Nesler</u>, 16 Cal.4th 561 (1997).)[15]
14
15       In addition, the Court of Appeal found "the trial evidence was overwhelming and could have
16
    easily supported a verdict of first degree murder," not merely the second-degree murder of which he
17
    was convicted.  (Lodg. 12, p. 21.)  "Without more compelling circumstances indicating that the jury
18
    was actually influenced or biased by the extrajudicial definition of 'malice,' we are precluded from
19
    setting aside the jury's verdict under the applicable standard of review."  (<u>Id.</u>)
20
         After *de novo* review of the trial record and the evidentiary hearing record, the Court finds the
21
    Court of Appeal reached an objectively reasonable result that is not contrary to the <u>Brecht</u> prejudice
22
    standard, for all the reasons recited by that court.   The totality of the deliberations lasted just two

23       [15] "Thus, this case is different from *People v. Nesler* [(1997)] 16 Cal.4th 561.  The defendant in *Nesler*
    was charged with killing the alleged molester of her young son.  The impact of possible methamphetamine use
24  on the defendant's mental state was an issue at trial.  The misconduct occurred when one juror revealed to the
    other jurors damaging information that she overheard in a bar regarding the defendant's sale and use of
25  methamphetamine.  The evidence presented in the trial court showed that the juror referred *repeatedly* to the
    damaging information and 'intentionally interjected this outside information into the deliberations when she
26  disagreed with the positions of other jurors.'" (Lodg. 12, p. 21 (pinpoint citations omitted).)  The <u>Nesler</u> court
    concluded "repeated references to and use of the outside information during deliberations establish[ed] a
27  substantial likelihood that her extraneous knowledge concerning the defendant caused her to prejudge issues
    that arose during deliberations and to render a verdict that was not based solely upon the evidence presented
28  in court." <u>Nesler</u>, 6 Cal.4th at 583.

days.  Unlike in <u>Marino</u> (30 days) and <u>Sassounian</u> (15 days), Tedeschi's jury did not engage in "lengthy deliberations."  There is no indication the jury could not reach a unanimous guilty verdict just before receiving the improper evidence.  *Cf*. <u>Mancuso</u>, 292 F.3d 939.  The evidentiary hearing record discloses deliberations focused on which of the two of the two murder degree charges should be found true, with malice an element of both.  The extrinsic definition was offered late in the process, reducing the likelihood any juror was affected by any deviant phrasing of a second definition of "malice," or that any juror actually relied on the extraneous definition.  No juror suggested there was any discussion of any material discrepancy or the import of any such discrepancy in the malice definitions.  Thus, the jury's consideration of an extrinsic but unidentified dictionary definition of "malice" during deliberations, while improper, did not have a substantial and injurious influence on the verdict, foreclosing federal habeas relief for lack of prejudice.  There is no reasonable probability that without the improper introduction of an extrajudicial definition of "malice" the result would have been different.  Accordingly, relief on this claim is **<u>DENIED</u>**.

### 3.    <u>Improper Prior Trial Speculation Was Not Prejudicial</u>

Tedeschi killed Leisten in November 1995.  He was not tried until February 1999.  He contends a juror erroneously represented he had a  prior trial due to the time lag, and others so speculated.  (Pet. pp. 11-13.)  He argues "jurors extensively discussed that he had been tried either once or twice previously for the charged offense," openly expressing "their collective concern that if they could not arrive at a verdict, petitioner would 'walk,' or go 'Scot-free.' "  (Pet. 6:3-5.)

> This jury was under enormous and undisclosed pressure to find Petitioner guilty of **some** offense regardless of the evidence. Nothing offered by the State dispels the fact that these jurors violated their oaths, and spent a good deal of time discussing this extrinsic fallacy. Nothing offered by the State shows that the trial court or counsel had any opportunity to correct the jurors' misguided notions.

(Pet. P&A 12:21-25.)

Respondent observes: "It is reasonable for a juror to wonder why there had been such a delay in bringing the case to trial."  (Answer 26:20-21.)  The individuals' recollections at the evidentiary

hearing were inconsistent.[16]  In denying the habeas petition on this issue, the Superior Court found:

> Any discussion about a previous trial was relatively brief and did not play a part in the verdict.  The jurors expressed a desire to reach a verdict and wondered out loud why the case was so old and what would happen if they hung.  While there certainly should not have been any discussion about this, **the evidence proves that the verdict reached was not as *a result of*** any misguided notion of a previous trial or the belief that the defendant would go free if they were a hung jury.

(Lodg. 10, pp. 2-3 (emphasis added).)

The Court of Appeal adopted the same view of the evidentiary hearing revelations:  no evidence suggests those discussion resulted in actual prejudice.

> Two jurors recalled that the topic of prior trials came up in connection with one juror's statement that she had read in a newspaper article that Tedeschi had been tried before.  Juror No. 044400 testified that one of the female jurors had read the newspaper or somehow found out about an article that said two juries had already hung, and the jury discussed that if they hung, Tedeschi "would walk free."  Juror No. 044400 testified the discussion was "brief" and occurred towards the end of deliberations.   Juror No. 010221 testified to recalling a discussion between two jurors in the hallway about there having been a previous trial; a female juror commented that she had read in the newspaper that Tedeschi had been tried before.  Juror No. 010221 could not recall the topic being discussed in the jury room.  Nor could Juror No. 010221 recall a discussion in the jury room of what the consequences would be if there was a hung jury.
>
> Juror No. 010117 testified that the jury discussed that if there was a hung jury, Tedeschi would " 'get off scott-free,' " [but ] could not recall how long the discussion lasted or how many people participated but testified "it wasn't long." [¶] Juror No. 010129 recalled there was some discussion that they could not let there be a hung jury or Tedeschi would go free.  According to Juror No. 010129, all the jurors participated in the discussion, and the subject "probably came out back and forth a few times" during the two days of deliberations. [¶] Juror No. 016713 also recalled that some of the jurors discussed that there had been other trials, and if there was a hung jury this time, Tedeschi could go free. [¶] Juror No. 016948, the foreperson, testified that the jury discussed that there had been a previous trial.  The jury discussed that this would be the second hung jury if they did not reach a verdict.  The jury discussed that Tedeschi might go "scott-free" if there was a hung jury.  They also discussed that there might be another trial, which would 'burden the family with the grief again . . . ." [¶] Juror No. 010218, Juror No. 0064776, and Juror No. 010217 recalled that there was some discussion of a previous trial but not what it would mean to Tedeschi if there was a hung jury. [¶] Juror No. 010213 testified that when the jury first went into the juror room, somebody

---

[16] Tedeschi highlights juror testimony on this issue in his Petition Points and Authorities at pages 11 to 13, and Respondent summarizes the evidentiary hearing testimony on this issue at Answer pages 18 and 26.

> asked whether this was the second trail, because there "was a long amount of time till it came to trial . . . . And everybody looked around. Nobody knew.  And that's all I remember about that."

(Lodg. 12, pp. 12-14.)

The Court of Appeal concluded the conduct "was not prejudicial because there was no evidence of juror bias arising therefrom under either [Carpenter] test discussed above." (Lodg. 12, p. 22.)  Viewing the information "objectively," the court "[could] not say that it was information that would have inherently and substantially influenced the jurors," because there was "nothing in the essential character of the information that Tedeschi had been unsuccessfully tried before, albeit erroneous, that was so prejudicial in the context of this trial that its introduction would warrant reversal of the judgment." (Id.)  The court also found it was not "substantially likely that the jury was actually biased against Tedeschi as a result of its discussion." (Id.)

> Tedeschi characterizes the discussion as having been extensive. However, the jurors' testimony was otherwise.  While a majority of jurors had some recollection of discussing whether Tedeschi had been tried before, fewer than half testified to recalling specifically discussing whether Tedeschi might go free if the jury failed to return a verdict. The jurors also had vague and conflicting recollections as to where and when these discussions took place.  For example, one juror said it came up a "few times" during the two days of deliberations, while another described it not coming up until the very end of deliberations.  Like his argument concerning the jury's receipt of an extrajudicial definition of malice, [this argument] is highly speculative in nature.  The record discloses no evidence of how the information affected the jurors' decisionmaking processes or suggesting the information was utilized . . . to Tedeschi's disadvantage.

(Lodg. 12, pp. 22-23.)

Tedeschi argues the jurors treated the erroneous information as "hard fact," and "they were pressured not to 'hang' out of irrational and inaccurate fear that a hung jury would end the case forever." (Pet. P&A 12:19-21.)  However, his argument cuts both ways.  Had the jury been persuaded he was not guilty, it would not have been concerned with whether he had been tried before and would have acquitted him.  Had the jury been persuaded it should convict him of "some offense" merely to avoid hanging and running the risk he would consequently go "scott-free," it could have found him guilty of one of the lesser-included manslaughter offenses on which it was instructed.  The jury deliberated conscientiously enough to find the prosecution failed to prove Tedeschi's guilt of first-

degree murder, as evidenced by its second degree murder verdict.  As noted by Respondent, from the evidentiary hearing record, a majority of his jurors compromised and agreed to convict him of a lesser degree of murder than the vast majority of their number originally wanted, suggesting any hung jury discussion may well have benefitted him.

> Three jurors (062954, 010218, and 044400) testified at the evidentiary hearing that **the vote was ten to two for first-degree murder**. (Lodging Doc. No. 9 [Exhibit B to Petition For Writ Of Habeas Corpus filed in superior court, Transcript of Evidentiary Hearing, p. 10 (062954), p. 146 (010218), p. 159 (044400)].)  It appears as though a compromise was reached in the Petitioner's favor when ten jurors made a decision to vote for second degree murder, instead of the first degree murder that each of those jurors had previously voted for.

(Answer 27:21-27 (emphasis added).)

The jury had a range of clear options, from first-degree murder to acquittal. The jury instructions as given appear at Lodgment 15, Vol. 11, RT 5721-5765.  The trial court took pains to ensure the verdict form reflected separately the options of guilty or not guilty as to each of the four homicide theories (*i.e.*, first-degree murder, second-degree murder, voluntary manslaughter, or involuntary manslaughter.)  (Lodg. 15, Vol. 11, RT 5675-5678, RT 5704.)  The jury was instructed on involuntary manslaughter (CALJIC 8.45, Special Instruction 32) based on the evidence of Tedeschi's intoxication and a theory of negligent discharge of the firearm while brandishing it.  (Id., RT 5644-5649.)  The court permitted the defense to argue voluntary intoxication as negating express or implied malice.  (Id., RT 5686.)   The court gave instructions on various self-defense theories, including CALJIC 5.25, a straight self-defense instruction the court found could be supported by the evidence and which would allow the jury to acquit him if they believed Tedeschi's version of the shooting.  (Id., RT 5653-5654, RT 5668-5669.)  The court also gave an excusable and justifiable general homicide instruction.  No accident or misfortune instruction was requested, but the trial court *sua sponte* observed there was no evidentiary basis for one, despite Tedeschi's use of those terms in describing the shooting.  (Id., RT 5705-5706.)

After *de novo* review, the Court finds no basis to conclude fear of a hung jury due to erroneous prior trial comments had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. While speculation about prior proceedings against him for his ex-

father-in-law's murder was extraneous and therefore improper, this is not a case where other crimes or prior bad acts information tainted deliberations, distinguishing this case from the cases finding prejudicial error associated with jury exposure to extrajudicial information about a defendant's criminal record or prior bad acts apart from the charged offense. Given the strong evidence of Tedeschi's guilt, including prominently Tiffani's eye-witness testimony, it would be objectively unreasonable to conclude the jury would have reached a result more favorable to him absent that misconduct. Therefore, the Court finds any constitutional error was harmless, and relief on this claim is **DENIED**.

### 4.   No Prejudice From Jurors' Consideration Of Punishment

Tedeschi argues the "jurors violated their oaths by deliberately and repeatedly disobeying explicit instructions not to discuss punishment during the guilt phase of the trial . . . . "blatantly disobey[ing]" their CALJIC No. 8.83.2 instruction "from start to finish."[17] (Pet. 6:11-17.) He complains the "Court of Appeal's January 17, 2008 opinion does not address this issue *at all*." (Id. 7:4-5.) However, the explanation for that omission is plain from the record. The California Supreme Court instructed the Court of Appeal to vacate its summary denial of Tedeschi's habeas petition and to reconsider just two of the three instances of juror misconduct found by the Superior Court: the "malice" extrajudicial definition, and the improper discussion of a previous trial. The Superior Court's third misconduct finding -- improper consideration of punishment during guilt phase deliberations had no substantial or injurious effect on the verdict -- was not disturbed by either the Court of Appeal or the California Supreme Court, nor was the Court of Appeal instructed to revisit that issue.

The only reasoned state court decision addressing this claim remains the Superior Court's July 6, 2005 decision finding jury misconduct, but no prejudice. (Lodg. 10.) The Superior Court determined, without citation to authority:

> 5) Did the jury discuss penalty or punishment during its deliberation and therefore commit misconduct? Yes. Does the evidence rebut any presumption of prejudice that resulted? Yes. Again, this "death qualified" jury briefly discussed an issue which they should not have

---

[17] "In your deliberations the subject of penalty or punishment is not to be discussed or considered by you. That is a matter which must not in any way affect your verdict or affect your finding as to the special circumstance (s) alleged in this case." CALJIC No. 8.83.2; *see* Pet. P&A 13:10-13.

> discussed.  Clearly the jury should not have discussed penalty or punishment at that stage of the trial even though in many ways it was natural to do so.  **However, any discussion did not cause them to find the defendant guilty of second degree murder instead of a lesser charge or instead of an acquittal**.

(Lodg. 10, p. 3 (emphasis added).)

Several jurors recalled at the evidentiary hearing some among them had openly stated during deliberations Tedeschi should be executed.  Some had also speculated how much time would attach to a second-degree murder conviction.   From those recollections, Tedeschi argues "[t]heir deliberations were focused more on punishment than upon the elements of each offense." (Pet. P&A 14:4-5.)

> They were instructed on second-degree murder, voluntary manslaughter, and involuntary manslaughter.  They were also instructed on the elements of heat of passion, provocation, cooling-off period, unreasonable belief in the necessity to defend, and justifiable homicide  (self-defense). (C.T. pp. 1209-1232.)  Yet the hot topic addressed by many of the jurors was that Petitioner should be executed or how much time he should serve.  It is no answer that this jury was "death-qualified" during hardship voir dire.  They were instructed specifically **not** to discuss punishment during the guilt phase, yet that is exactly what they did.

(Pet. P&A 14:5-12 (footnote omitted).)

No evidence supports Tedeschi's characterization the deliberations were "more" focused on potential punishment than guilt, or that the "hot topic" of his potential execution or other sentence preoccupied the jurors.  Their testimony established no temporal distribution of any particular subject matter discussions. Moreover, this issue strikes the Court as entailing no "extraneous influence" such as might authorize incursion into the mechanics of the jury's deliberations, but posits an inquiry that risks encroaching on jurors' subjective thought processes in reaching their verdict, an inquiry prohibited under FED. R. EVID. 606(b).  Just because some improper, speculative discussion occurred, it cannot be said that proper deliberations were consequently and necessarily circumvented. Nevertheless, even if such considerations were construed as extraneous information, error without prejudice cannot support federal habeas relief.  Brecht, 507 U.S. at 637.

Tedeschi criticizes the court for having purportedly "proceeded directly to the bald conclusion that 'the trial evidence was overwhelming and could . . . have supported a verdict of first degree

1   murder," ignoring controlling federal law, citing <u>Brecht</u>.  (Pet. P&A 14:20-15:18.)  He argues  "the

2   Court of Appeal recited the State's case against Petitioner and declared it sufficient to support the

3   verdict," but in so doing, "the Court 'improperly place[d] itself in the role of the jury,' disregarding the

4   admonition of <u>Kotteakos</u> and its progeny," with that "departure from settled federal law mandat[ing]

5   reversal."  (Pet. P&A 15: 16-20, quoting <u>Sassounian</u>, 230 F.3d at 1112.)  The Court finds, on the

6   contrary, the state courts appropriately reviewed the evidence *de novo*, correctly applied the harmless-

7   error analysis to all three instances of juror misconduct, and reached an objectively reasonable result

8   with respect to each, consistent with controlling federal authority.

9          After *de novo* review, the Court finds no evidentiary support for Tedeschi's characterization

10  of penalty discussions as having prejudiced the guilt phase due to some overarching preoccupation

11  with that subject matter.  The evidentiary hearing revealed a majority of the jurors promoted an

12  execution-eligible verdict of first-degree murder but ultimately did not prevail.  Given the second-

13  degree murder verdict, it appears probable all were convinced beyond a reasonable doubt fairly

14  quickly Tedeschi committed a murder, with deliberations focused on which degree. This Court is left

15  in no "grave doubt" the error of discussing punishment during the guilt phase of the trial  in the

16  speculative manner the jurors described had a "substantial and injurious effect" on the verdict.

17  <u>Medina</u>, 386 F.3d at 877.  The second-degree murder conviction suggests the discussion likely

18  redounded to Tedeschi's advantage, particularly if certain jurors' expressed aversion to having to make

19  a death penalty decision is credited.  The Court finds no reasonable probability that without the

20  penalty consideration the result would have been more favorable to Tedeschi. On this record, the

21  Superior Court's opinion on the issue of punishment discussion is objectively reasonable and is not

22  contrary to the <u>Brecht</u> standard.  Federal habeas relief on this ground is accordingly **<u>DENIED</u>**.

23         When "no single trial error examined in isolation is sufficiently prejudicial to warrant reversal,

24  the cumulative effect of multiple errors may still prejudice a defendant." <u>United States v. Frederick</u>,

25  78 F.3d 1370, 1381 (9th Cir. 1996).  As traced above, the government's case against Tedeschi was

26  strong, and in the context of all the evidence, this was not a close case for the second-degree murder

27  conviction.   Tedeschi's three juror misconduct claims, individually or collectively, were not

28

1   sufficiently prejudicial to warrant federal habeas relief.

2   **III.     CONCLUSION AND ORDER**

3          For all the foregoing reasons, the Court finds the state courts' determinations none of the

4   instances of juror misconduct raised in Tedeschi's Petition had a substantial or injurious effect on the

5   verdict were not contrary to nor an unreasonable application of controlling federal authority,

6   foreclosing habeas relief.  Accordingly, the Petition is **DENIED** in its entirety, with judgment to be

7   entered accordingly.

8          A Certificate of Appealability ("COA") is required pursuant to 28 U.S.C. § 2253(c) before a

9   petitioner can pursue an appeal.  AEDPA permits a court to issue a COA when "the applicant has

10  made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "[T]he

11  issuance of a COA is not precluded where the petitioner cannot meet the standard to obtain a writ of

12  habeas corpus."  Lambright v. Stewart, 220 F.3d 1022,  1025 (9th Cir. 2000); *see* Barefoot v. Estelle,

13  463 U.S. 880, 893 n.4 (1983);  Slack v. McDonald, 529 U.S. 473 (2000).  The Court **GRANTS**

14  Tedeschi a COA with regard to the improper introduction of an extrajudicial definition of "malice"

15  into jury deliberations, but **DENIES** a COA as to the two other juror misconduct claims raised in this

16  Petition.

17         **IT IS SO ORDERED**.

18

19  DATED:  December 9, 2009

20                                                                   _____
                                                                     Honorable Janis L. Sammartino
21                                                                   United States District Judge

22

23

24

25

26

27

28